**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| O'REILLY AUTO ENTERPRISES, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:24-cv-09274 |
| | ) | |
| CITY OF HARVEY, ILLINOIS; | ) | Hon. Manish S. Shah |
| CHRISTOPHER J. CLARK; and | ) | |
| CAMERON BIDDINGS; | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

# EXHIBIT A

## FIFTH LEASE MODIFICATION AGREEMENT
### Harvey, IL—Store #3372

This Fifth Lease Modification Agreement (the "Agreement"), made and entered into this **29** day of **July**, 2022, by and between Harvey Shopping Center, LLC, an Illinois limited liability company (the "Landlord") and O'Reilly Auto Enterprises, LLC, a Delaware limited liability company (the "Tenant").

WITNESSETH:

Whereas, under Shopping Center Lease dated March 15, 1996, as amended by that certain Amendment to Shopping Center Lease dated July 31, 1996, Second Amendment to Shopping Center Lease dated March 1, 2011, Third Agreement to Shopping Center Lease dated December 15, 2015, and Fourth Lease Modification Agreement dated June 30, 2021(collectively, the "Lease"), Landlord leased to Tenant the premises located at 14921 South Dixie Highway, Harvey, IL, as more particularly described in the Lease and on the terms and conditions set out therein, and;

Whereas, the term of the Lease currently expires on November 30, 2026, and;

Whereas, Tenant and Landlord desire to modify and amend the Lease terms and rents.

Now, therefore, in consideration of the promises, covenants and agreements hereinafter set out, the parties hereby agree as follows:

1.      The rent shall be as follows for the Extended Term:

| Existing Term | |
|---|---|
| August 1, 2022 - November 30, 2026 | $8,500.00 per month |

2.      Tenant hereby exercises one (1) of its three (3) existing five (5) year options and the term of the Lease is extended to November 30, 2032 (the "Extended Term").

3.      The rent shall be as follows for the Extended Term:

| Extended Term | |
|---|---|
| December 1, 2026 - November 30, 2032 | $8,500.00 per month |

4.      Tenant retains its two (2) remaining options and Tenant is granted one (1) additional option to extend the Lease for a period of five (5) years each beyond the Extended Term (collectively, the "Renewal Options").

5.      To exercise the Renewal Options, Tenant shall notify Landlord in writing at least ninety (90) days prior to the expiration of the Extended Term or prior to the expiration of any previously extended option period.



DEFENDANT'S
EXHIBIT
NO. 9

#3372 Harvey, IL
Page 1 of 3

6. The rent for each of the Renewal Options shall be as follows:

| Renewal Options | |
|---|---|
| December 1, 2032 - November 30, 2037 | $9,180.00 per month |
| December 1, 2037 - November 30, 2042 | $9,914.40 per month |
| December 1, 2042 - November 30, 2047 | $10,707.12 per month |

7. All notices and other communications required or permitted to be given hereunder shall be in writing and shall be effective as of (i) the date of delivery, if served in person, (ii) two (2) days after the date of mailing, if served by certified or registered mail, postage prepaid and return receipt requested, (iii) the next succeeding business day after deposit with a responsible overnight delivery service similar to UPS and/or Federal Express, (iv) upon receipt, if delivered by facsimile with confirmed transmittal, or (v) upon receipt, if delivered by email with confirmed transmittal. If the last day for giving notice or performing any act hereunder falls on a Saturday, Sunday, or day on which the main post office at Springfield, Missouri, is not open for the regular transaction of business, the time shall be extended to the next day that is not a Saturday, Sunday, or post office holiday.

LANDLORD:
Harvey Shopping Center, LLC
1875 Century Park East, Ste. 940
Los Angeles, CA 90067
*Email: rkatz@rodeolending.com*
*Additional email to:sschumer@mpslaw.com*

For Emergencies:
McKay Investment Realty, Inc.
(630) 990-2000

For Overnight Deliveries:
Daniel J. McKay
McKay Investment Realty, Inc.
2121 Midwest Road, Suite 106
Oak Brook, IL 60523

TENANT:
O'Reilly Auto Enterprises, LLC
Attn: Property Manager
P.O. Box 1156
Springfield, MO 65802
propertymanagement@oreillyauto.com

Loss Prevention & Alarm Services
(417) 829-5855

O'Reilly Auto Enterprises, LLC
Attn: Property Manager
233 S. Patterson Ave.
Springfield MO 65801

8. This Agreement may be executed in any number of counterparts, each of which is deemed an original. The counterparts together constitute one agreement. Any signature on a copy of this Agreement or any document necessary or convenient thereto sent electronically and/or by fax is binding upon transmission and such copy may be used for the purposes of this Agreement.

9. Except as expressly modified and amended by this Agreement, the terms and conditions of the Lease continue in full force and effect; provided, however, that in the event of any conflict in the provisions of the Lease and the provisions of this Agreement, the provisions of this Agreement govern and control.

10. Each individual executing this Agreement on behalf of Landlord and Tenant represents and warrants that he or she is duly authorized to execute and deliver this Agreement on behalf of Landlord or Tenant, each individual or entity is in fact the true Landlord or Tenant and that this Agreement is binding upon Landlord or Tenant. Each person executing this Agreement on behalf of Tenant and Landlord hereby covenants and warrants that Tenant and Landlord, as the case may be, is duly incorporated, formed or organized.

In Witness whereof, the parties hereto have executed the above and foregoing instrument the day and year above written.

LANDLORD:
Harvey Shopping Center, LLC,
an Illinois limited liability company

Rodeo Capital, Inc.
a California corporation

By: Richard Katz
Its: President

TENANT:
O'Reilly Auto Enterprises, LLC,
a Delaware limited liability company

By: Scott Kraus
Its: Senior Vice President

## FOURTH LEASE MODIFICATION AGREEMENT
### Harvey, IL—Store #3372

This Fourth Lease Modification Agreement (the "Agreement"), made and entered into this 30th day of June 2021, by and between Harvey Shopping Center, LLC, an Illinois limited liability company (the "Landlord") and O'Reilly Auto Enterprises, LLC, a Delaware limited liability company (the "Tenant").

WITNESSETH:

Whereas, under Shopping Center Lease dated March 15, 1996, as amended by that certain Amendment to Shopping Center Lease dated July 31, 1996, Second Amendment to Shopping Center dated March 1, 2011, and Third Agreement to Shopping Center Lease dated December 15, 2015 (collectively, the "Lease"), Landlord leased to Tenant the premises located at 14921 South Dixie Highway, Harvey, IL, as more particularly described in the Lease and on the terms and conditions set out therein, and;

Whereas, the term of the Lease currently expires on November 30, 2021, and;

Whereas, Tenant and Landlord desire to modify and amend the Lease terms and rents.

Now, therefore, in consideration of the promises, covenants and agreements hereinafter set out, the parties hereby agree as follows:

1.      Tenant hereby exercises one (1) of its three (3) existing five (5) year options, and the term of the Lease is extended to November 30, 2026 (the "Extended Term").

2.      The rent shall be as follows for the Extended Term:

| Extended Term | |
|---|---|
| December 1, 2021 – November 30, 2026 | $9,441.67 per month |

3.      Tenant retains its two (2) remaining options and Tenant is granted one (1) additional option to extend the Lease for a period of five (5) years each beyond the Extended Term (collectively, the "Renewal Options")

4.      To exercise the Renewal Options, Tenant shall notify Landlord in writing at least ninety (90) days prior to the expiration of the Extended Term or prior to the expiration of any previously extended option period.

5.      The rent for each of the Renewal Options shall be as follows:

| Renewal Options | |
|---|---|
| December 1, 2026 – November 30, 2031 | $10,197.00 per month |
| December 1, 2031 – November 30, 2036 | $11,012.76 per month |
| December 1, 2036 – November 30, 2041 | $11,893.79 per month |

6.      All notices and other communications required or permitted to be given hereunder shall be in writing and shall be effective as of (i) the date of delivery, if served in person, (ii) two (2) days after the date of mailing, if served by certified or registered mail, postage prepaid and return receipt requested, (iii) the next succeeding business day after deposit with a responsible overnight delivery service similar to UPS and/or Federal Express, (iv) upon receipt, if delivered by facsimile with confirmed transmittal, or (v) upon receipt, if delivered by email with confirmed transmittal.  If the last day for giving notice or performing any act hereunder falls on a Saturday, Sunday, or day on which the main post office at Springfield, Missouri, is not open for the regular transaction of business, the time shall be extended to the next day that is not a Saturday, Sunday, or post office holiday.

| | |
|---|---|
| **LANDLORD:** | **TENANT:** |
| Harvey Shopping Center, LLC | O'Reilly Auto Enterprises, LLC |
| c/o Rodeo Capital, Inc. | Attn: Property Manager |
| 1875 Century Park East, Suite 940 | P.O. Box 1156 |
| Los Angeles, CA 90067 | Springfield MO 65802 |
| ghernstein@rodeolending.com | propertymanagement@oreillyauto.com |

with a copy to:

PRG Management
1000 N Milwaukee Ave
Chicago, IL 60642
Attn: Bridget Connolly
bridget@prg-management.com

| | |
|---|---|
| For Emergencies: | |
| PRG Management | **Loss Prevention & Alarm Services** |
| (312) 600-8896, X106 | (417) 829-5855 |

| | |
|---|---|
| For Overnight Deliveries: | |
| See Landlord Address above | O'Reilly Auto Enterprises, LLC |
| | Attn: Property Manager |
| | 233 S. Patterson Ave. |
| | Springfield MO 65801 |

7.      This Agreement may be executed in any number of counterparts, each of which is deemed an original. The counterparts together constitute one agreement.  Any signature on a copy of this Agreement or any document necessary or convenient thereto sent electronically and/or by fax is binding upon transmission and such copy may be used for the purposes of this Agreement.

8.      Except as expressly modified and amended by this Agreement, the terms and conditions of the Lease continue in full force and effect; provided, however, that in the event of any conflict in the provisions of the Lease and the provisions of this Agreement, the provisions of this Agreement govern and control.

9.      Each individual executing this Agreement on behalf of Landlord and Tenant represents and warrants that he or she is duly authorized to execute and deliver this Agreement on behalf of Landlord or Tenant, each individual or entity is in fact the true Landlord or Tenant and that this Agreement is binding upon Landlord or Tenant. Each person executing this Agreement on behalf of Tenant and Landlord hereby covenants and warrants that Tenant and Landlord, as the case may be, is duly incorporated, formed or organized.

In Witness whereof, the parties hereto have executed the above and foregoing instrument the day and year above written.

LANDLORD:                                         TENANT:
Harvey Shopping Center, LLC,                      O'Reilly Auto Enterprises, LLC,
an Illinois limited liability company             a Delaware limited liability company
By:     Rodeo Capital, Inc.
        a California corporation

                                    President

By: Richard Katz                                  By: Scott Kraus
Its: President                                    Its:  Senior Vice President

## THIRD AGREEMENT TO SHOPPING CENTER LEASE
### Harvey, IL (OR#3372)

This Third Agreement to Shopping Center Lease, hereinafter referred to as "Agreement", made and entered into this 15 day of December, 2015, by and between Midwest Bank and Trust Company Trust No 04-1-8268 dated 6/16/2004 (the "Landlord") and O'Reilly Auto Enterprises, LLC, a Delaware limited liability company, as assignee of O'Reilly Automotive Stores, Inc. (the "Tenant").

WITNESSETH:

Whereas, under Lease dated March 15, 1996, as amended by the Lease Amendment to the Shopping Center lease dated July 31, 1996, as amended by the Assignment dated June 5, 2009, as amended by the Second Amendment to Shopping Center Lease dated March 1, 2011, as amended by Assignment of Lease dated January 1, 2014 (collectively, the "Lease"), Landlord leased to Tenant the premises located at 14921 South Dixie Highway, Harvey, Illinois, as more particularly described in the Lease and on the terms and conditions set out therein;

Whereas, the extended term of the Lease expires on November 30, 2016;

Whereas, Tenant desires to exercise its first option of the Second Amendment to Shopping Center Lease to extend the lease term until November 30, 2021;

Whereas, Tenant desires to obtain two (2) options in addition to its one (1) remaining option to extend the Lease for an additional five (5) years each ("Renewal Options"); and

Whereas, Tenant desires to amend section 3 of the Second Amendment to Shopping Center Lease.

Now, therefore, in consideration of the promises, covenants and agreements hereinafter set out, it is agreed by and between the parties as follows:

1. Tenant hereby exercises its first option of the Second Amendment to Shopping Center Lease and the term of the Lease is extended to November 30, 2021 (the "Extended Term").

2. Section 3 of the Second Amendment to Shopping Center Lease shall be amended and replaced with the rent and option rent as stated herein. The monthly rent shall be as follows for the Extended Term:

| Extended Term | |
|---|---|
| December 1, 2016 to November 30, 2021 | $9,441.67 per month |

3. Tenant retains its one (1) existing option and Tenant is granted two (2) additional options to extend the Lease for a period of five (5) years each beyond the Extended Term (collectively, the "Renewal Options").

4.     To exercise any of the Renewal Options, Tenant shall notify Landlord in writing at least ninety days (90) days prior to the expiration of the Extended Term or prior to the expiration of any previously extended option period.

5.     The monthly Base Rent shall be as follows for the Renewal Options:

| Renewal Options | |
| --- | --- |
| December 1, 2021 to November 30, 2026 | $10,385.84 per month |
| December 1, 2026 to November 30, 2031 | $11,424.42 per month |
| December 1, 2031 to November 30, 2036 | $12,566.86 per month |

6.     This Agreement may be executed in any number of counterparts, each of which is deemed an original.  The counterparts together constitute one agreement.  Any signature on a copy of this Agreement or any document necessary or convenient thereto sent electronically and/or by fax is binding upon transmission and such copy may be used for the purposes of this Agreement.

7.     Except as expressly modified and amended by this Agreement, the terms and conditions of the Lease continue in full force and effect; provided, however, that in the event of any conflict in the provisions of the Lease and the provisions of this Agreement, the provisions of this Agreement govern and control.

8.     Each individual executing this Agreement on behalf of Landlord and Tenant represents and warrants that he or she is duly authorized to execute and deliver this Agreement on behalf of Landlord or Tenant, each individual or entity is in fact the true Landlord or Tenant and that this Agreement is binding upon Landlord or Tenant.  Each person executing this Agreement on behalf of Tenant and Landlord hereby covenants and warrants that Tenant and Landlord, as the case may be, is duly incorporated, formed or organized.

In Witness whereof, the parties hereto have executed the above and foregoing instrument the day and year above written.

LANDLORD:
Midwest Bank and Trust Company
Trust No. 04-1-8268 dated 6/16/04

By: Harvey Town Square LLC, an
Illinois limited liability company, its
Agent

By:  Steve Homatas
Its:  Manager

TENANT:
O'Reilly Auto Enterprises, LLC
a Delaware limited liability company,
as assignee of O'Reilly Automotive
Stores, Inc.

By:   Scott Kraus
Its:   Vice President

6027983265          Oreilly                              11:27:38 a.m.    12-07-2015        3/46

## SECOND AMENDMENT TO SHOPPING CENTER LEASE
### (Harvey, IL - #3372)

This Second Amendment to Shopping Center Lease made and entered into this _1_ day of _March_ 2011, by and between Steve Homatas, as Agent for the Beneficiaries of Midwest Bank and Trust Company Trust No. 04-1-8268 dated 6/16/04, hereinafter referred to as "Landlord," and O'Reilly Automotive, Inc., a Missouri corporation, hereinafter referred to as "Tenant."

WITNESSETH:

Whereas, under Shopping Center Lease dated March 15, 1996, Amendment to Shopping Center Lease dated July 31, 1996, Assignment of Leases dated June 29, 2004 and Notice of Transaction and Assignment dated March 30, 2009 (hereinafter "the Lease"), Landlord leased to Tenant the premises located at 14921 South Dixie Highway, Harvey, Illinois, as more particularly described in "the Lease" and on the terms and conditions set out therein, and;

Whereas, the term of the Lease expires on November 30, 2011, and;

Whereas, the Tenant desires to extend the Lease until November 30, 2016;

Now, therefore, in consideration of the promises, covenants, and agreements hereinafter set out, it is agreed by and between the parties as follows:

1.     The term of the Lease is extended to November 30, 2016.

2.     Tenant shall have two (2) options of five (5) years each remaining.

3.     The rent shall be as follows:

| | | | |
|---|---|---|---|
| 12/1/2011 - 11/30/2016 | $9,166.67 | per month | Extension Term |
| 12/1/2016 - 11/30/2021 | $10,083.33 | per month | 1st Extension Option |
| 12/1/2021 - 11/30/2026 | $11,091.67 | per month | 2nd Extension Option |

4.     To exercise any of the options, Tenant shall notify Landlord in writing of its desire to exercise the option. Said notice shall be made to Landlord at least ninety (90) days prior to the expiration of the original Lease term, or, prior to the expiration of any previously extended option period.

5.     This Amendment may be executed in any number of counterparts, each of which is deemed an original. The counterparts together constitute one agreement. Any signature on a copy of this Amendment or any document necessary or convenient thereto sent electronically and/or by fax is binding upon transmission and such copy may be used for the purposes of this Amendment.

6.     All sections, paragraphs, provisions, covenants, and agreements set forth and stated in the Lease as amended which are not specifically altered, amended, or supplemented hereby, are ratified by the parties hereto and shall remain in full force and effect.

In Witness whereof, the parties hereto have executed the above and foregoing instrument the day and year above written.

LANDLORD:                                          TENANT:
Steve Homatas, as Agent for the Beneficiaries      O'Reilly Automotive, Inc.
of Midwest Bank and Trust Company
Trust No. 04-1-8268 dated 6/14/04

By: Steve Homatas                                  By: Ted Wise
                                                   Its: COO / Co-President

6027983265      Oreilly                                11:27:14 a.m.      12-07-2015      2 /46

407

## AMENDMENT TO SHOPPING CENTER LEASE

THIS AMENDMENT TO LEASE ("Amendment") is made as of this 31st day of July , 1996, by and between HSS Development, Inc., an Illinois corporation ("Landlord") and Murray's Discount Auto Stores, Inc., a Michigan corporation ("Tenant").

### W I T N E S S E T H:

WHEREAS, on the 15th day of March, 1996, Landlord and Tenant entered into a lease ("Lease"), demising unto Tenant that certain space ("Premises") having dimensions of approximately 100 feet by 100 feet and containing approximately 10,000 square feet of floor area located in an outlot building to be constructed within the shopping center commonly known as Southwest Square Shopping Center, Harvey, Illinois, 60426, as more particularly described in the Lease; and

WHEREAS, the Landlord and Tenant deem it to be in their respective best interests to amend certain of the terms, conditions and provisions of the Lease as hereinafter provided; and

NOW, THEREFORE, in consideration of the Premises and the mutual promises contained in this Amendment and for the sum of One Dollar ($1.00) in hand-paid, the receipt and sufficiency of which is hereby acknowledged, the Landlord and Tenant do hereby agree to amend the Lease as follows:

1. Landlord warrants that it shall, at its sole cost and expense, provide and install the security grilles on the exterior storefront windows as shown on the construction plans dated May 24, 1996 and prepared by Arcline Associates Ltd.

2. Tenant's schedule of Minimum Rent for the first ten years of the Lease Term, as provided for under Article 4 of the Lease, shall be revised to reflect the following schedule:

| Period | $ Per Sq. Ft. | Annual Minimum Rent | Monthly Minimum Rent |
|--------|---------------|---------------------|----------------------|
| 1-10   | $10.23        | $102,300.00         | $8,525.00            |

In all other respects, other than as modified herein, the Lease shall remain in full force and effect and be binding upon the parties thereto and hereto in accordance with the terms thereof.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on this day and year first above set forth.

TENANT:                                      LANDLORD:
MURRAY'S DISCOUNT AUTO STORES, INC.          HSS DEVELOPMENT, INC.
a Michigan corporation                       an Illinois corporation

By: _____                  By: _____
Scott R. Isdaner                             Mitchell Saywitz
Its: Chief Executive Officer                 Its: Vice President

6027983265          Oreilly                                    11:27:02 a.m.    12-07-2015        1/46



To:       Spiro Siavelis  , Fax#: 702-515-6721
Cc:
Subject:  OR#3372, Harvey, IL
From:     Janice Salem/PHX/OReilly - Monday 12/07/2015 11:42 AM

Per your request I am faxing the lease and amendments.   Please let me know if there is anything else you
need.  Thank you.

Janice Salem
Lease Administration Specialist
OReilly Auto Parts
702 E. Bethany Home Road
Phoenix, AZ  85014
Direct Line: 602-798-3233
Facsimile No:602-798-3266
Email: Jsalem@O'Reillyauto.com

*Original*

407

# SHOPPING CENTER LEASE

between

## HSS DEVELOPMENT, INC.

an Illinois corporation

as Landlord

and

## MURRAY'S DISCOUNT AUTO STORES, INC.

a Michigan corporation

as Tenant

for Premises located in the

Southwest Square Shopping Center

City of Harvey

County of Cook

State of Illinois

# INDEX

| | | | |
|---|---|---|---|
| Parties | Article | 1 - Page | 1 |
| Premises | " | 2 - Page | 1 |
| Use; Exclusive Use; Prohibited Use | " | 3 - Page | 1 |
| Minimum Rent; Commencement Date | " | 4 - Page | 2 |
| Term of Lease | " | 5 - Page | 4 |
| Additional Charges | " | 6 - Page | 5 |
| Uses Prohibited | " | 7 - Page | 8 |
| Compliance with Law | " | 8 - Page | 8 |
| Alterations and Additions | " | 9 - Page | 8 |
| Repairs | " | 10 - Page | 9 |
| Liens | " | 11 - Page | 11 |
| Assignment and Subletting | " | 12 - Page | 11 |
| Hold Harmless | " | 13 - Page | 11 |
| Subrogation | " | 14 - Page | 12 |
| Insurance | " | 15 - Page | 12 |
| Utilities | " | 16 - Page | 13 |
| Personal Property Taxes | " | 17 - Page | 14 |
| Rules and Regulations | " | 18 - Page | 14 |
| Holding Over | " | 19 - Page | 14 |
| Entry by Landlord | " | 20 - Page | 15 |
| Tenant Default | " | 21 - Page | 16 |
| Remedies in Default | " | 22 - Page | 18 |
| Default by Landlord | " | 23 - Page | 19 |
| Damage and Reconstruction | " | 24 - Page | 20 |
| Eminent Domain | " | 25 - Page | 22 |
| Parking and Common Areas | " | 26 - Page | 22 |
| Signs | " | 27 - Page | 23 |
| Displays | " | 28 - Page | 24 |
| Auctions | " | 29 - Page | 24 |
| Intentionally Deleted | " | 30 - Page | 24 |
| General Provisions | " | 31 - Page | 24 |
| Brokers | " | 32 - Page | 28 |
| Intentionally Deleted | " | 33 - Page | 28 |
| Sign Criteria | " | 34 - Page | 28 |
| Hazardous Substances | " | 35 - Page | 29 |
| Option(s) to Renew | " | 36 - Page | 30 |
| Exculpation | " | 37 - Page | 31 |
| Relationship of Parties | " | 38 - Page | 32 |
| Waiver of Jury Trial | " | 39 - Page | 32 |
| Construction | " | 40 - Page | 32 |
| Land Trust | " | 41 - Page | 32 |
| Signature Page | | Page | 33 |

Exhibits:

    A- Site Plan
    B- Landlord/Tenant Work
    C- Intentionally Deleted
    D- Tenant Estoppel
    E- Non-Disturbance and Attornment Agreement

6027983265          Orellly                                    11:29:02 a.m.     12-07-2015          7 /46

# SHOPPING CENTER LEASE

1.   **PARTIES.** This Lease is dated as of this 15th day of _March_____, 1998 by and

between HSS Development, Inc., an Illinois corporation, with principal offices at 35 West Wacker Drive,

Suite 3240, Chicago, Illinois 60601, as "Landlord" and Murray's Discount Auto Stores, Inc., a Michigan

corporation, with principal offices at 8080 Haggerty Road, Belleville, Michigan 48111, as "Tenant."

2.    **PREMISES.** Landlord does hereby lease to Tenant, and Tenant hereby leases from Landlord

that certain space (the "Premises") having dimensions of approximately 100 feet by 100 feet and

containing approximately 10,000 square feet of floor area located in an outlot within the shopping center

commonly known as Southwest Square Shopping Center, Harvey, Illinois, 60426 (the buildings, the land,

and all common areas and parking facilities contained thereon shall be collectively referred to herein as the

"Shopping Center"). The location and dimensions of said Premises are delineated on Exhibit "A"

attached hereto and incorporated by reference herein.

3.     **USE; EXCLUSIVE USE; PROHIBITED USE.** Tenant shall use the Premises for the retail

and wholesale sale of automobile related parts and accessories to the public, and for any other lawful retail

purpose, excepting: grocery store, supermarket, dollar store or any use which is the same as or similar to

the primary use of any other tenant (or future tenant) unless Tenant's then-existing and continuous use

precedes the primary use of said future tenant) in the Shopping Center, however, the foregoing shall not

inhibit Tenant's right to operate as a retailer and/or wholesaler of automobile related parts and accessories.

      Notwithstanding anything to the contrary contained in this Lease, Tenant shall not be obligated to

conduct or to remain open for the conduct of any business in the Premises after opening initially as a

Murray's. In the event Tenant ceases to operate its business in the Premises (except in the event of fire or

damage or any other cause beyond Tenant's control) for more than ninety (90) days, Landlord, at its sole

option, may terminate the Lease and take possession of the Premises upon thirty (30) days' prior written

notice to Tenant.

      Landlord, its respective heirs, executors and administrators, assigns and successors in title during

the term of this Lease and any options herein granted will not lease, rent, occupy or permit to be

occupied, or sell any premises now or hereafter contained in the Shopping Center without a covenant

prohibiting their use or occupancy as a business primarily engaged in the sale of auto parts and

accessories and no such premises shall be used or occupied for any such purpose. Landlord further

1

agrees that it shall not lease, rent, occupy or permit any premises in the Shopping Center to be occupied for any noxious or offensive use, for manufacturing or for use as a bowling alley, funeral parlor, bingo parlor, warehouse (except for such warehouse as shall be incidental to a permitted use) and no such premises shall be used or occupied for any such purpose. In the event of a breach of these covenants, Tenant shall be entitled forthwith to full and adequate relief by injunction and/or otherwise from the consequences of such a breach of these covenants, including, at its option, the right to cancel this Lease or to withhold or abate the payment of rent due or to become due hereunder for the duration of any such violation of these covenants, but such rights as to cancellation and withholding or abatement of rent shall exist only in the event that the owner of the Shopping Center at the time of such breach has caused or permitted the same.

Notwithstanding anything to the contrary contained in this Lease, Tenant, its respective heirs, executors and administrators, assigns and successors in title during the term of this Lease and any options herein granted shall not use, occupy, permit to be occupied or sublease its Premises for any noxious or offensive use, for manufacturing or for use as a bowling alley, funeral parlor, bingo parlor, warehouse (except for such warehouse as shall be incidental to a permitted use) and the Premises shall be used or occupied for any such purpose.

4.      **MINIMUM RENT; COMMENCEMENT DATE.** Tenant agrees to pay to Landlord Minimum Rent ("Minimum Rent") according to the following schedule:

| Period | $ Per Sq. Ft. | Annual Minimum Rent | Monthly Minimum Rent |
|---|---|---|---|
| Years 1-10 | $10.00 | $100,000.00 | $8,333.33 |
| Years 11-15 | $11.00 | $110,000.00 | $9,166.67 |

| Option Rent: | | | |
|---|---|---|---|
| Period | $ Per Sq. Ft. | Annual Minimum Rent | Monthly Minimum Rent |
| Years 16-20 | $12.10 | $121,000.00 | $10,083.33 |
| Years 21-25 | $13.31 | $133,100.00 | $11,091.67 |
| Years 26-30 | $14.64 | $146,400.00 | $12,200.00 |

Minimum Rent shall be paid equal monthly installments in advance on the first day of each and every calendar month during the Lease Term (as hereinafter defined). If the Rent Commencement Date (as hereinafter defined) is not the first day of the month, the Minimum Rent for that month shall be prorated based upon 1/365th of the annual Minimum Rent for each day of such fractional month. Tenant agrees

2

to pay all Minimum Rent and other Rent (as hereinafter defined) in lawful money of the United States in person to Landlord or its designated agent, or to such person or place as Landlord may from time to time designate in writing, without prior demand and without any defense, deduction or offset, except as herein provided.

Tenant's obligation to pay Rent hereunder shall commence upon sixty (60) days after substantial completion of Landlord's Work as set forth in the approved plans and specifications (the "Plans") attached hereto and incorporated herein by reference, or when the Tenant opens for business, whichever is sooner (the "Rent Commencement Date"). Landlord agrees that it will, at its sole cost and expense, as soon as is reasonably possible after the execution of this Lease, but in any event within one hundred and five (105) days after the execution of this Lease (excluding, however, without limitation, any period of delay caused directly or indirectly by strikes or similar causes beyond the reasonable control of Landlord, and as provided for under Article 31 (K) provided hereinbelow), commence and pursue to completion the improvements to be erected by Landlord to the extent shown on the Plans. In the event Landlord fails to commence construction of the improvements within one hundred and eighty (180) days after the execution of this Lease, Tenant may terminate this Lease effective forty-five (45) days after written notice to Landlord by Tenant. In the event construction commences prior to the end of the notice period, Tenant's right to terminate shall expire. The term "substantial completion of Landlord's Work" is defined as the date on which Landlord delivers to Tenant a certificate of occupancy for the Premises (if such certificate is available from the City of Harvey, Illinois); and Landlord's Work specified in Plans is substantially complete, with the exception of such work as Landlord cannot complete until Tenant performs necessary portions of its work (the "Commencement Date"). Landlord shall substantially complete Landlord's Work and so deliver the Premises to Tenant within one hundred and fifty (150) days after commencement of construction. Such one hundred and fifty (150) day period shall, however, exclude without limitation any period of delay caused directly or indirectly by strikes or similar causes beyond the reasonable control of Landlord, nor shall this Lease be affected by such causes, as further provided for under Article 31 (K) hereinbelow. In the event the substantial completion of Landlord's Work has been delayed by Tenant, or Tenant's agent or employee, then the date of substantial completion shall be the date on which Landlord's Work would have been substantially completed but for such delay. Tenant shall commence the installation of fixtures, equipment, and any of Tenant's work as set forth in the

3

Plans promptly upon substantial completion of Landlord's Work and shall diligently prosecute such installation to completion, and shall open the Premises for business not later than the expiration of said 60- (sixty-) day period.

In the event the Premises have not been completed by the proscribed period, Tenant may terminate this Lease, effective forty-five (45) days after written notice to Landlord by Tenant. In the event the Premises are completed prior to the end of the notice period, Tenant's right to terminate shall expire.

Landlord shall prepare plans and specifications for the construction of the Premises in accordance with Tenant's construction criteria attached hereto as Exhibit "B" ("Criteria") and submit same to Tenant for Tenant's approval within thirty (30) days after the date of this Lease. If Tenant requires any changes to such plans and specifications which do not increase the scope of work depicted in the Plans, Landlord shall revise same in accordance with Tenant's requirements and submit such revised plans and specifications to Tenant within ten (10) days after receipt of Tenant's request. Tenant shall approve the plans and specifications within ten (10) days after submission by Landlord.

Upon written approval of such plans and specifications by Tenant, Landlord, at its sole cost and expense, shall construct the Premises in accordance with such approved plans and specifications. All such construction shall be done in a first-class manner and in accordance with all applicable laws, ordinances and codes.

Notwithstanding anything herein contained to the contrary, Tenant shall have the right to submit a so-called "punch list" of incomplete or defective items in Landlord's construction within sixty (60) days after the Commencement Date. Upon receipt of such punch list, Landlord shall promptly complete such incomplete items and remedy such defective items. Landlord shall also be responsible for latent defects in Landlord's construction of which it is notified in writing within one (1) year after the Commencement Date.

5.      TERM OF LEASE. This Lease shall be for a period of fifteen (15) years beginning on the Rent Commencement Date as set forth in Article 4 (the "Lease Term"). The parties hereto acknowledge that certain obligation under various articles hereof may commence prior to the Lease Term, i.e. construction, hold harmless, liability insurance, etc., and the parties agree to be bound by these articles prior to the commencement of the Lease Term. At the request of Landlord, Tenant shall promptly execute and

4

deliver to Landlord a statement confirming the Commencement Date, the Rent Commencement Date and the Lease Term once those dates are determined.

6.    **ADDITIONAL CHARGES.**

    A.    **Intentionally Deleted.**

    B.    **Adjustments.**

        (i)    In addition to the Minimum Rent provided for in Article 4 herein, and commencing on the Rent Commencement Date, Tenant shall pay to Landlord Tenant's Proportionate Share (as hereinafter defined) of the following items as additional Rent (herein collectively called "Adjustments"):

        (A)    All real estate taxes, assessments (whether general or special), sewer rents, rates and charges and any other federal, state or local governmental taxes, assessments or charges, including the reasonable costs and expenses of any tax protest or appeal, that are levied upon and/or assessed against the Shopping Center, including the land and improvements thereon, during the Lease Term hereof, and including any sales, use or other taxes or assessments which may be levied on rents (collectively, the "Taxes"). Landlord agrees to use all reasonable means at its disposal to hold any tax increases to a minimum and agrees to contest any tax increase which Landlord believes is unreasonable. Nothing herein shall be construed so as to require Tenant to pay all or any part of any income, gift or estate taxes now or hereafter levied against Landlord. Tenant's proportionate share of taxes for the first lease year are estimated to be two dollars and forty cents ($2.40) per square foot of the Premises. The term "lease year," as used herein, means a period of twelve (12) consecutive months during the Lease Term commencing on the initial Rent Commencement Date of this Lease.

        (B)    All insurance premiums for fire and hazards, extended coverage, liability and workman's compensation with respect to the Building (collectively, the "Insurance"), which shall be due .

        (C)    All costs and expenses paid or incurred by or on behalf of Landlord for managing, operating, repairing, maintaining, supervising and administering the Shopping Center, including all common areas, parking lots, sidewalks, driveways, and other areas used in common by the tenants or occupants of the Shopping Center, including, but not by way of limitation, all costs for electricity, water, sewers, window cleaning, common area janitorial service; trash, snow and ice removal; cleaning and sweeping; re-striping and re-paving of the parking areas; planting and replacing decorations,

5

flowers and landscaping; exterior painting; maintenance, repair and replacement of utility systems; management fees and expenses; reserve funds; supplies; wages and salaries of all persons engaged in the operation, maintenance and repair of the Shopping Center; and all security expenses. Said costs shall exclude any expenses for utilities which are separately metered and paid by any tenant at the Shopping Center. Said costs shall include such fees as may be paid to a third party in connection with same.

Notwithstanding anything contained herein to the contrary, Tenant shall not be required to pay its proportionate share of any capital improvement costs during the term of this Lease and shall not be required to pay its proportionate share of structural and/or roof repairs to the buildings during the initial five (5) years of the Lease term. All costs and expenses shall be reasonable and customary and shall be competitively priced relative to the marketplace.

Tenant's Proportionate Share (as herein defined) of such cost and expense of operating the common area for the first lease year is estimated to be one dollar and ten cents ($1.10) per square foot of the Premises.

(D)     INTENTIONALLY DELETED.

(E)     For purposes hereof, "Tenant's Proportionate Share" shall mean the percentage obtained by dividing the total leasable floor area of the Premises by the total leasable floor area of the Shopping Center which is from time to time completed as of the first day of each calendar quarter (provided that if the leasable floor area of the Shopping Center changes, Tenant's proportionate share shall change and Landlord will notify Tenant of such change). If, however, any Tenants in the Shopping Center pay taxes directly to any taxing authority or carry their own insurance, as may be provided in their leases, their square footage shall not be deemed a part of the total leasable floor area for the determination of tax or insurance payments).

(ii)     Upon commencement of Tenant's obligation to pay Rent hereunder, Landlord shall submit to Tenant a statement of the anticipated monthly Adjustments for the period between such commencement and the following January  and Tenant shall pay these Adjustments on  a monthly basis concurrently with the payment of the Rent.  Tenant shall continue to make said monthly payments until notified by Landlord of change thereof.  By March 1st of each year Landlord shall give Tenant a statement showing the total Adjustments for the Shopping Center for the prior calendar year and Tenant's allocable

6

share thereof, prorated from the Rent Commencement Date.  In the event the total of the monthly payments which Tenant has made for the prior calendar year be less than the Tenant's actual share of such Adjustments, then Tenant shall pay the difference in a lump sum within thirty (30) days after receipt of such statement from Landlord and shall concurrently pay the difference in monthly payments made in the then calendar year and the amount of monthly payments which are then calculated as monthly Adjustments based on the prior year's experience.  Any over-payment by Tenant shall be credited towards the monthly Minimum Rent next coming due, and promptly refunded to Tenant with respect to the last year of the term.  The actual Adjustments for the prior year shall be used for purposes of calculating the anticipated monthly Adjustments for the then current year with actual determination of such Adjustments after each calendar year as above provided .  Even though the Lease Term will have expired and Tenant will have vacated the Premises when the final determination is made of Tenant's share of said Adjustments for the year to which this Lease terminates prorated to the date of termination, Tenant shall immediately pay any increase due over the estimated Adjustments previously paid and, conversely, any over-payment made shall be immediately rebated by Landlord to Tenant.  Failure of Landlord to submit statements as called for herein shall not be deemed to be a waiver of Tenant's requirement to pay sums as herein provided, unless the same are not delivered within twelve (12) months after the end of such year.

Tenant shall have the right to audit Landlord's book and records relating to such expenses at Landlord's accounting office upon ten (10) days' advance written notice.  If such audit shall disclose that Tenant's payments have exceeded the amount required under the terms of this Article 6 by more than two percent (2%),  Landlord shall promptly refund the cost of such audit.  In any event, Landlord shall promptly refund any overpayment to Tenant.

(III)     All Minimum Rent, Adjustments and any and all other amounts and charges which may at any time be owed by Tenant to Landlord under this Lease shall be collectively referred to herein as "Rent."

(IV)     In the event that any extraordinary service(s), including but not limited to security services, is (are) provided by Landlord to Tenant exclusively at Tenant's written request and not to any other tenant at the Shopping Center, Tenant shall be responsible for and shall pay one hundred percent (100%) of the expense of such service(s).

7

7.  USES PROHIBITED.  Tenant shall not do or permit anything to be done in or about the Premises nor bring or keep anything therein which is not within the permitted use of the Premises which will in any way increase the existing rate of or affect any fire or other insurance upon the Shopping Center or any of its contents, or cause a cancellation of any insurance policy covering the Shopping Center or any part thereof or any of its contents.  Tenant shall not do or permit anything to be done in or about the Premises which will materially obstruct or interfere with the rights of other tenants or occupants of the Building or Shopping Center or injure other tenants or use or allow the Premises to be used for any unlawful purpose, including, without limitation, the holding or conducting of any auction on or about the Premises; nor shall Tenant cause, maintain or permit any nuisance in, on or about the Premises.  Tenant shall not commit or allow to be committed any waste in or upon the Premises or the Shopping Center.

8.      COMPLIANCE WITH LAW.  Tenant shall not use the Premises  or do anything  in or about the Premises or the Shopping Center which will in any way conflict with any law, statute, ordinance or governmental rule or regulation now in force or which may hereafter be enacted or promulgated.  Tenant shall, at its sole cost and expense, promptly comply with all laws, statutes, ordinances and governmental rules, regulations or requirements now in force or which may hereafter be in force and with the reasonable requirements of any board of fire underwriters or other similar bodies now or hereafter constituted relating to or affecting the condition, use or occupancy of the Premises, excluding structural changes not related to or affected by Tenant's improvements or acts.

Any provision of this Lease to the contrary notwithstanding, there shall be no obligation on the part of Tenant to comply with any such laws, directions, rules and regulations which may require structural alterations, structural changes or structural additions, and Landlord shall be responsible to so comply, unless made necessary by act or work performed by Tenant, in which event Tenant shall comply at its expense.

Landlord shall promptly comply with all laws, ordinances and lawful orders and regulations affecting the Premises and the Shopping Center other than those required to be complied with by Tenant pursuant to this Article 8.

9.      ALTERATIONS AND ADDITIONS.  Tenant shall not make or allow to be made any structural or exterior alterations, additions or improvements to or of the Premises or any part thereof without first obtaining the written consent of Landlord, and Tenant's Work and  any alterations, additions or

8

improvements to or of said Premises, including, but not limited to, gas, plumbing and sewers, electric, wall covering, paneling and built-in cabinet work, but excepting furniture, trade fixtures and business equipment, shall at once become a part of the realty and belong to the Landlord and shall be surrendered with the Premises at the expiration of the Lease Term. All such alterations, additions or improvements to the Premises by Tenant shall be made by Tenant at Tenant's sole cost and expense, and Tenant shall deliver to Landlord, prior to the commencement of any such work relating to structural or exterior alterations, additions or improvements to or of the Premises or any part thereof, all plans, specifications and permits which Landlord or any applicable governmental body may require for the construction or performance of such work. Upon the expiration or sooner termination of the Lease Term hereof, Tenant shall, upon written demand by Landlord given at least thirty (30) days prior to the end of the Lease Term, at Tenant's sole cost and expense, forthwith and with all due diligence, remove any alterations, additions, or improvements made by Tenant designated by Landlord to be removed, and Tenant shall, forthwith and with all due diligence, at its sole cost and expense, repair any damage to the Premises caused by such removal.

Notwithstanding anything herein contained to the contrary, (i) Tenant may make interior nonstructural alterations without Landlord's consent and (ii) Tenant shall not be required to remove any alterations installed in accordance with plans approved by Landlord or for which Landlord's consent was not required.

In the event that, after the Commencement Date, any governmental body or agency, whether federal, state or local, requires that certain alterations be made to the Premises, Tenant shall promptly make such alterations and otherwise comply with such law, statute or regulation, unless the same are structural in nature. If Tenant fails to promptly comply with Tenant's obligations hereunder, Landlord, at its sole option, may make the alterations and, in such event, Tenant shall reimburse Landlord for the reasonable cost of such alterations within the next month's payment of Rent hereunder.

10.     **REPAIRS.**

A.      Tenant shall, at Tenant's sole cost and expense, keep the Premises and every part thereof in good condition and repair (except as hereinafter provided with respect to Landlord's obligations and unless such maintenance and repairs are caused in part or in whole by the act, neglect, fault or omission of any duty by Landlord, it agents, servants, employees in which case Landlord shall repair the

9

same at its expense), including without limitation, the maintenance, replacement and repair of any storefront, doors, window casements, glazing, plumbing, pipes, electrical wiring and conduits, and heating and air conditioning system. Tenant shall obtain a annual service contract for repairs and maintenance of said heating, ventilating and air conditioning system, which shall conform to the requirements under the warranty on said system. In the event Tenant's use involves the sale, distribution or preparation of any type of food or beverages (including but not by way of limitation, packaged or prepared foods or beverages), Tenant shall procure an annual extermination and pest control service contract and deliver to Landlord proof of such extermination and or pest control service contract and shall renew said service contract each year during the Lease Term, and deliver proof thereof to Landlord. Tenant shall, upon the expiration or sooner termination of this Lease, surrender the Premises to the Landlord in good condition, broom clean, ordinary wear and tear, Landlord's repair obligations, fire and casualty, and damage from cause beyond the reasonable control of Tenant excepted.

Landlord shall also repair and maintain the heating, ventilating and air conditioning system serving the Premises for a one- (1-) year period commencing on the Commencement Date. Additionally, Landlord shall warranty the compressor unit for a five (5) year period commencing on the Commencement Date.

B.     Notwithstanding the provisions of Article 10.A, hereinabove, Landlord shall repair and maintain the structural portions of the Shopping Center, including the exterior walls and roof, unless such maintenance and repairs are caused in part or in whole by the act, neglect, fault or omission of any duty by the Tenant, its agents, servants or employees, in which case Tenant shall pay to Landlord the actual cost of such maintenance and repairs. Landlord shall not be liable for any failure to make such repairs or to perform any maintenance unless such failure shall persist for an unreasonable time after written notice of the need of such repairs or maintenance is given by Tenant to Landlord and, if required, Landlord's lender. Except as provided in Article 24 hereof, there shall be no abatement of Rent and no liability by reason of any injury to or interference with Tenant's business arising from the making of any repairs, alterations or improvements in or to any portion of the Shopping Center or the Premises or in or to fixtures, appurtenances and equipment therein. Notwithstanding anything herein to the contrary, Landlord shall use its best efforts not to interfere with the operation of Tenant's business while making any repair, alteration or improvement.

10

11.     **LIENS.** Tenant shall keep the Premises and the Shopping Center free from any liens arising out of any work performed, materials furnished (including but not limited to Tenant's Work) or obligations incurred by or on behalf of Tenant.

12.     **ASSIGNMENT AND SUBLETTING.** Except as herein provided, Tenant shall not either voluntarily, or by operation of law, assign, transfer, mortgage, pledge, hypothecate or encumber this Lease or any interest therein, and shall not sublet the said Premises or any part thereof, or any right or privilege appurtenant thereto, or allow any other person (the employees, agents, servants and invitees of Tenant excepted) to occupy or use the Premises, or any portion thereof, without first obtaining the written consent of Landlord, which consent shall not be unreasonably withheld. A consent to one assignment, subletting, occupation or use by any other person shall not be deemed to be a consent to any subsequent assignment, subletting, occupation or use by another person. Consent to any such assignment or subletting shall in no way relieve Tenant of any liability under this Lease. Any such assignment or subletting without such consent shall be void, and shall, at the option of the Landlord, constitute a default under the terms of this Lease.

Notwithstanding the provisions of this Article 12, Tenant may, without Landlord's consent, assign this Lease or sublet the Premises to an affiliate of Tenant or to any corporation with which Tenant may merge or consolidate or to which all or substantially all of Tenant's assets are sold.

13.     **HOLD HARMLESS.** Tenant shall indemnify and hold harmless Landlord, and its employees, partners and officers, against and from any and all claims arising from Tenant's use of the Premises or from the conduct of its business or from Tenant's Work, or from any activity, work, or other things done, permitted or suffered by the Tenant in or about the Premises, and shall further indemnify and hold harmless Landlord, and its employees, partners and officers, against and from any and all claims arising from any act or negligence of the Tenant, or any of Tenant's agents, employees or invitees, and from all reasonable costs, attorneys' fees, and liabilities incurred in or about the defense of any such claim or any action or proceeding brought thereon and in case any action or proceeding brought against Landlord by reason of such claim. Tenant, upon notice from Landlord, shall defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord. Tenant, as a material part of the consideration to Landlord, hereby assumes all risk of damage to property or injury to persons in, upon or about the Premises, from any cause other than Landlord's negligence, and Tenant hereby waives all claims in respect thereof

11.

against Landlord. Tenant shall give prompt notice to Landlord in case of material casualty or accidents in the Premises. Landlord or its agents or employees shall not be liable for any loss or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, snow, ice, water or rain which may leak from any part of the Shopping Center or from the pipes, appliances or plumbing works therein or from the roof, street or subsurface or from any other place resulting from dampness or any other cause whatsoever, unless caused by or due to the negligence of Landlord, its agents or employees. Landlord or its agents shall not be liable to interference with the light or air.

Landlord shall indemnify and hold harmless Tenant, and its employees, partners and officers, from and against any and all claims arising from any activity, work, or other things done by the Landlord, its agents, servants, invitees or employees, in or about the Premises or the Shopping Center, and shall further indemnify and hold harmless Tenant, and its employees, partners and officers, from and against any and all claims arising from any negligent act of the Landlord, and from all costs, attorneys' fees, and liabilities incurred in or about the defense of any such claim or any action or proceeding brought thereon and in case any action or proceeding brought against Tenant by reason of such claim. Landlord, upon notice from Tenant, shall defend the same at Landlord's expense by counsel reasonably satisfactory to Tenant.

14.    **SUBROGATION.** As long as their respective insurers so permit, Landlord and Tenant hereby mutually waive their respective rights of recovery against each other for any loss insured or required to be insured by fire, extended coverage and other property insurance policies existing for the benefit of the respective parties. Each party shall apply to their insurers to obtain said waivers. Each party shall obtain any special endorsements, if required by their insurer to evidence compliance with the aforementioned waiver.

15.    A.    **TENANT'S INSURANCE.** At all times from and after the Commencement Date, Tenant shall, at Tenant's expense, obtain and keep in force the following insurance policies:

1.    Comprehensive public liability insurance insuring Landlord and Tenant against any liability arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be in the amount of not less than $1,000,000.00 for injury or death of one person in any one accident or occurrence and in the amount of not less than $5,000,000.00

12

for injury or death of more than one person in any one accident or occurrence. Such insurance shall further insure Landlord and Tenant against liability for property damage of at least $1,000,000.00.

     2.    Workman's Compensation insurance in statutory limits.

     3.    Intentionally Deleted.

The limit of any such insurance shall not, however, limit the liability of the Tenant hereunder. Tenant may provide this insurance under a blanket policy, provided that said insurance shall have a Landlord's protective liability endorsement attached thereto. If Tenant shall fail to procure and maintain said insurance after thirty (30) days' notice and Tenant's failure to cure, Landlord may, but shall not be required to, procure and maintain same; but at the expense of Tenant. Insurance required hereunder shall be in companies rated B+ or better in "Best's Key Rating Guide". Tenant shall deliver to Landlord, prior to possession and prior to right of entry, certificates of insurance required herein or certificates evidencing the existence and amount of such insurance with loss payable clauses satisfactory to Landlord. All such policies shall be written as primary policies not contributing with and not in excess of coverage which Landlord may carry. All such policies shall provide notice to Landlord at least thirty (30) days prior to any cancellation, renewal or reduction in coverage.

     B.    **LANDLORD'S INSURANCE:** Landlord shall maintain insurance covering the Premises (and all improvements therein or additions thereto other than trade fixtures, signs, inventory and those items which Tenant is required to insure) and all Shopping Center buildings against loss or damage by fire or casualty, with the usual extended coverage endorsements, all in amounts not less than replacement value from time to time above foundation walls.

     Landlord shall maintain public liability insurance on an occurrence basis with a minimum single limit of two million dollars ($2,000,000.00) insuring Landlord against all claims, demands or actions for personal injury or death, or damage to property, made by or on behalf of any person, firm or corporation, while on the common areas of the Shopping Center, or arising from the conduct and operation of the common areas or arising from any acts or omissions of Landlord or any of Landlord's agents, employees or contractors upon the common areas.

16.    **UTILITIES:** Commencing as of the Commencement Date. Tenant shall pay for all water, gas, heat, light, power, sewer charges, telephone service and all other services and utilities supplied and

separately metered to the Premises, together with any taxes thereon. If the sewer charges are not separately metered to Tenant, Tenant shall pay Tenant's Proportionate Share of such charges, which shall be included within the Adjustments.

17.    **PERSONAL PROPERTY TAXES.**  Tenant shall pay, or cause to be paid, before delinquency any and all taxes levied or assessed and which become payable during the Lease Term hereof upon all Tenant's equipment, furniture, fixtures and any other personal property which shall be assessed and taxed with the real property. Tenant shall pay to Landlord its share of such taxes within ten (10) days after delivery to Tenant by Landlord of a statement in writing setting forth the amount of such taxes applicable to Tenant's property.

18.    **RULES AND REGULATIONS.**  Tenant shall faithfully observe and comply with the reasonable and non-discriminatory rules and regulations that Landlord shall from time to time promulgate and/or modify. The reasonable and non-discriminatory rules and regulations shall be binding upon the Tenant upon delivery of a copy of them to Tenant. Landlord shall not be responsible to Tenant for the nonperformance of any said rules and regulations by any other tenants or occupants, however, Landlord shall enforce upon all tenants of the Shopping Center, to the best of its ability, the rules and regulations governing the Shopping Center.

19.    **HOLDING OVER.**   On the last day of the Lease Term hereof, or upon any earlier termination of this Lease, Tenant shall quit and surrender the Premises to Landlord in good order, condition and repair, except for damage by fire or other casualty, Landlord's repair obligations and ordinary wear and tear, and Tenant shall remove all of Tenant's property therefrom except as otherwise expressly provided in this Lease and shall restore the Premises wherever such removal results in damage thereto.

Upon the termination of this Lease, the Lease Term and estate granted by this Lease shall end at midnight of the date of termination as if such date were the date of expiration of the Lease Term and neither party shall have any further obligation or liability to the other after such termination (i) except as shall be otherwise provided for in this Lease, or (ii) except for such obligations as by its nature or under the circumstances can only be, or by the provisions of this Lease, may be performed after such termination, and in any event, unless expressly otherwise provided in this Lease, any liability for a payment of which shall have accrued to, or with respect to any period ending at the time of termination shall survive the

14

termination of this Lease, including but not limited to any monetary or other defaults by Tenant and payment of Adjustments and Taxes, as provided for in this Lease.

If Tenant or anyone claiming under Tenant shall remain in possession of the Premises or any part thereof after the expiration of the Lease Term, without any express written agreement between Landlord and Tenant with respect thereto, the person remaining in possession shall be deemed a tenant at sufferance, and such person's occupancy during such holding over shall be subject to all of the applicable terms and conditions of this Lease other than fixed annual Minimum Rent and those relating to the length of the Lease Term, and in addition thereto Tenant shall pay to Landlord as damages, in addition to the Adjustments and additional Rents reserved in this Lease) an amount equal to one hundred and twenty-five percent (125%) of the annual Minimum Rent due during the last twelve (12) months of the Lease Term and one hundred percent (100%) of the Adjustments and other charges payable hereunder (including, without limitation, Tenant's Adjustments) for each and every day after the expiration of the Lease Term, up to and including the day possession of the Premises is surrendered. The acceptance of Rent or other payments by Landlord shall not create a new or additional tenancy other than as aforesaid.

20.    **ENTRY BY LANDLORD.**  Landlord reserves, and shall at any and all times have, the right to enter the Premises during Tenant's usual business hours, upon reasonable notice to Tenant, to inspect the Premises, to submit said Premises to prospective purchasers or tenants, to post notices of non-responsibility, to repair the Premises and any portion of the Shopping Center that Landlord may deem necessary or desirable, without abatement of Rent, and may for that purpose erect any other necessary structures where reasonably required by the character of the work to be performed, always providing that the business of the Tenant shall not be interfered with unreasonably.  Tenant hereby waives any claim for damages or for any injury or inconvenience to or interference with Tenant's business, any loss of occupancy or quiet enjoyment of the Premises, and any other loss occasioned thereby.  Landlord shall have the right to use any and all means which Landlord may deem proper in order to obtain entry in any emergency without liability to Tenant except for any failure to exercise due care for Tenant's property and any entry to the Premises obtained by Landlord by any of said means, or otherwise, shall not under any circumstances be construed or deemed to be a forcible or unlawful entry into, or a detainer of, the Premises, or an eviction of Tenant from the Premises or any portion thereof.

21.   **TENANT DEFAULT.**

A.     The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Tenant (an "**Event of Default**"):

(I)     INTENTIONALLY DELETED.

(II)     The failure by Tenant to make any payment of Rent or any other payment required to be made by Tenant hereunder, as and when due, where such failure shall continue for a period of ten (10) days after receipt of notice that such payment is due.

(III)     The failure by Tenant to observe or perform any of the covenants, conditions or provisions of this Lease to be observed or performed by the Tenant, other than described in Article 21.A(II), above, where such failure such continue for a period thirty (30) days after written notice thereof by Landlord to Tenant; provided, however, that if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within said thirty (30) day period and thereafter diligently prosecutes such cure to completion.

(IV)     The making by Tenant of any general assignment or general arrangement for the benefit of creditors; or the filing by or against Tenant of a petition to have Tenant adjudged a bankruptcy, or a petition or reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within seventy-five (75) days of the appointment of a trustee or a receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease (where possession is not restored to Tenant within seventy-five (75) days); or the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where such seizure is not discharged with seventy-five (75) days.

B.     In addition to all other rights and remedies of Landlord which are provided in this Lease, Landlord shall have the following rights and remedies with respect to certain bankruptcy considerations:

(I)     If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. paragraph 101 et seq.; any and all monies or other considerations payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of the Tenant or of the

16

estate of Tenant within the meaning of the Bankruptcy Code. Any and all monies or other considerations constituting Landlord's property under the preceding sentence not paid or delivered to Landlord shall be promptly paid to or turned over to Landlord.

(II)    If Tenant assumes this Lease and proposes to assign the same pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. paragraph 101 et seq., to any person or entity who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to the Tenant, then notice of such proposed assignment setting forth (a) the name and address of such person, (b) all of the terms and conditions of such offer, and (c) the adequate assurance to be provided Landlord to assure such person's future performance under the lease, including, without limitation, the assurance referred to in Section 365 of the Bankruptcy Code, shall be given to Landlord by the Tenant no later than twenty (20) days after receipt by the Tenant, but in any event no later than ten (10) days prior to the date that the Tenant shall make application to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption, and Landlord shall thereupon have the prior right and option, to be exercised by notice to the Tenant given at any time prior to the effective date of such proposed assignment, to accept an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such person, less any brokerage commission which may be payable out of the consideration to be paid by such person for the assignment of this Lease.

(III)    This is a Lease of real property in a shopping center within the meaning of Section 365 (b) (3) of the Bankruptcy Code, 11 U.S.C. paragraph 365 (b) (3).

(IV)    Notwithstanding anything in this Lease to the contrary, all amounts payable by Tenant to or on behalf of the Landlord under this Lease, whether or not expressly denominated as rent, shall constitute rent for the purposes of Section 502 (b) (6) of the Bankruptcy Code, 11 U.S.C. paragraph 502 (b) (6).

(V)    Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. paragraph 101 et. seq., shall be deemed without further act or deed to have assumed all the obligations arising under this Lease on and after the date of such assignment. Any such assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption.

17

(VI)    In the event this Lease is assumed pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. paragraph 101 et. seq., "adequate assurance of future performance" by the assignee shall include, but shall not necessarily be limited to, the following:

(A)    A substantial security deposit; and

(B)    The net worth of the Assignee; and

(C)    A security interest in favor of the Landlord in property of the trustee or assignee to secure performance of the Tenant's obligations under the Lease.

(VII)    In the event the Premises continues to be occupied by a Tenant-debtor-in-possession pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. paragraph 101 et seq., "adequate protection" for the Landlord shall include, but shall not necessarily be limited to, the following:

(A)    Continued payment of rent during and until such time as is affirmed or rejected; and

(B)    The hiring of security or other personnel to protect the Premises; and

(C)    The continued maintenance of adequate insurance; and

(D)    The grant of a security interest in Tenant's other property to secure any loss to the Landlord.

22.    **REMEDIES IN DEFAULT.**  If an Event of Default occurs hereunder, Landlord may at any time thereafter, in its sole discretion, and without notice or demand and without limiting Landlord in the exercise of a right or remedy which Landlord may have by reason of such default or breach:

A.    Terminate this Lease and Tenant's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Tenant shall immediately surrender possession of the Premises to Landlord, without any right by Tenant to reinstate its rights by payment of Rent or other amounts due or other performance of the terms and conditions hereof.  In such event Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default including, but not limited to, the reasonable cost of recovering possession of the Premises; reasonable expenses of reletting, including reasonable brokerage commissions, advertising expenses, reasonable attorneys' fees; and that portion of any leasing commission paid by Landlord and applicable to the unexpired Lease Term hereof.  Unpaid installments of Rent and other sums shall bear interest from the date due at the prime rate, as published in the Wall Street Journal, plus three percent (3%); or

16

B.      With or without terminating this Lease, re-enter and repossess the Premises, or any part

thereof, and re-let the Premises or any part thereof to any other person upon such reasonable terms as

Landlord shall determine for Tenant's account, for a reasonable term within or beyond the Lease Term, in

which case this Lease shall continue in effect whether or not Tenant shall have abandoned the Premises

and, to the extent Landlord receives the rents therefor, Landlord shall apply the same first to the payment

of Landlord's expenses in recovering possession of the Premises, including, without limitation, attorneys'

fees and court costs, and any other reasonable expenses, commissions and charges paid, assumed or

incurred by or on behalf of Landlord in connection with the reletting of the Premises, and then to the

fulfillment of the covenants under this Lease. In such event Landlord shall be entitled to enforce all of

Landlord's rights and remedies under this Lease, including the right to recover the Rent and any other

charges and Adjustments from Tenant as may become due hereunder. Notwithstanding any reletting

without termination of this Lease, Landlord shall have the right to terminate this Lease at any time; or

C.      Pursue any other remedy now or hereafter available to Landlord under the laws or judicial

decisions of the State in which the Premises are located.

D.      Notwithstanding any of the terms and provisions herein contained to the contrary,

Landlord and Tenant shall each have the duty and obligation to mitigate in every reasonable manner any

and all damages that may or shall be caused or suffered by virtue of default under or violation or any of the

terms and provisions of this Lease committed by the other.

23.     **DEFAULT BY LANDLORD.** Landlord shall not be in default unless Landlord fails to perform

obligations required of Landlord within a reasonable time, but in no event later than thirty (30) days after

written notice by Tenant to Landlord specifying wherein Landlord has failed to perform such obligation;

provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) days are

required for performance, then Landlord shall not be in default if Landlord commences performance within

such thirty (30) day period and thereafter diligently prosecutes the same to completion; provided,

however, that in the case of a bona fide emergency, no such notice or an opportunity to cure shall be

provided. If Landlord fails to cure any default which materially impairs Tenant's ability to conduct business

in the Premises, Tenant may (at its option and in addition to its other legal remedies) cure such default for

the account of Landlord, in a reasonable manner, and any sum so expended by Tenant, provided the

charges are reasonable and customary, shall be paid by Landlord to Tenant within thirty (30) days after the

19

presentation of a statement therefor, together with lien waivers from any and all contractors or suppliers. If such statement is not so paid within said thirty- (30-) day period, Tenant shall have the right to set off such amount against the rents next becoming due hereunder.

24.    DAMAGE AND RECONSTRUCTION.

A.    Tenant shall give prompt notice to Landlord in case of a material fire or other damage to the Premises .

B.    In the event of the happening of any of the following events:

(i)    The Premises shall be damaged to the extent of more than 50% of the cost of replacement thereof; or

(ii)    The aggregate gross leasable area of the Shopping Center shall be damaged to the extent of more than 25% of the cost of replacement thereof; or

(iii)    The Premises or a substantial portion of the Shopping Center within a radius of 50 feet of the main entrance to the Premises (whether or not the Premises are damaged) shall be damaged to the extent of 50% or more of the cost of replacement thereof or shall be rendered untenantable as a result of an occurrence which is not required to be covered by Landlord's insurance; or

(iv)    The stores in the Shopping Center have been damaged or destroyed by a casualty not covered or required to be covered by insurance and Landlord elects not to rebuild or repair such stores; or

(v)    The Premises shall be damaged in whole or in part (other than a de minimis portion). Landlord or Tenant may, at its option, terminate this Lease by giving the other written notice within ninety (90) days after the happening of any of the aforesaid events that it has elected to terminate this Lease, such termination to be on a date specified in its notice of termination which date shall be not less than thirty (30) nor more than sixty (60) days after the date of such notice; provided, however, that if Tenant then has the right to renew the Lease pursuant to Article 36 hereof, Tenant may vitiate Landlord's notice of termination by exercising its option to so renew by written notice to Landlord within forty-five (45) days after receipt of Landlord's notice of termination. Upon the termination of this Lease, in accordance with such election, Tenant shall:

(A)    Vacate and surrender the Premises in accordance with the provisions of this Lease; and

(B)    Pay the Rent to the date of termination of the Lease, unless Tenant shall be unable to operate its business, in which event Tenant's obligation to pay Rent shall abate as of the date

20

of the casualty as to the part that is unsuitable to operate, and, after the termination date, Tenant's liability for Rent shall cease. If the casualty, or reconstruction necessitated by any of the events hereinabove specified in this subparagraph, shall render the Premises untenantable in whole or in part, then from the date when the damage occurred until completion of the reconstruction or, in the event Landlord elects to terminate this Lease, until the date of termination, the Rent shall abate in the proportion which the portion of the Premises rendered untenantable bears to the gross leasable area of the Leased Premises; provided if Tenant is unable to reasonably operate in the Premises, the entire Premises shall be deemed untenantable.

Upon the termination of the Lease, pursuant to this Article 24, Tenant's liability for Rent shall cease as of the effective date of the termination of this Lease, subject, however, to the provisions of the prior abatement of Rent hereinafter set forth.

C.        If this Lease shall not be terminated as provided in Article 24 hereof, Landlord shall, at its expense, proceed with the repair or restoration of the Premises and adjacent areas existing immediately prior to such damage or destruction, provided that Landlord shall not be required to repair or replace Tenant's stock in trade, fixtures, furniture, furnishings, floor coverings and equipment.

D.        All repairs and restoration of Tenant's trade fixtures, business equipment and other personal property shall be performed by Tenant at Tenant's expense. All work of restoration by either party shall restore the Premises to as good and substantially the same condition as existed prior to the casualty and shall be done in conformity with all applicable Exhibits.

E.        If Landlord is required or elects to repair the Premises as herein provided, Tenant shall repair or replace its stock in trade, fixtures, furniture, furnishings, floor coverings and equipment.

F.        If this Lease is not terminated, as aforesaid, this Lease shall remain in full force and effect and the parties waive the provision of any law to the contrary. Except to the extent of the abatement of the Minimum Rent as hereinabove set forth, the Tenant shall perform all of its obligations under this Lease. Tenant shall not be entitled to and hereby waives all claims against Landlord for any compensation or damage of loss of use of the whole or any part of the Premises and/or for any inconvenience or annoyance occasioned by any such damage, destruction, repair or restoration.

21

**25.  EMINENT DOMAIN.**

A.    If any portion of the Premises or the Shopping Center shall be taken by condemnation or right of eminent domain, the Landlord shall immediately send written notice thereof to Tenant, and Landlord shall have the right to terminate this Lease by giving written notice to Tenant of its intention to do so not later than thirty (30) days after receipt by Tenant of such notice. In the event that more than ten percent (10%) of the Premises is taken by condemnation or right of eminent domain, Tenant may elect to terminate the Lease by giving Landlord written notice of its intention to do so not later than thirty (30) days after receipt by Tenant of such notice of said condemnation or taking. Should Landlord or Tenant not exercise the rights of termination aforesaid, Landlord shall promptly restore that which remains of the Premises, or the Shopping Center, to an architectural unit as nearly like its condition prior to such taking, as shall be practicable.

B.    If the right of termination is not exercised, then until the Premises is restored (if the Premises or any part thereof has been included in the taking) there shall be an equitable reduction in Tenant's Rent.

C.    Landlord reserves, and Tenant assigns to Landlord, all rights to damages on account of any taking or condemnation or any act of any public or quasi public authority for which damages are payable. Tenant shall execute such instruments of assignment as Landlord requires, join with Landlord in any action for the recovery of damages, if requested by Landlord, and turn over to Landlord any damages recovered in any proceeding. However, Landlord does not reserve any damages payable for trade fixtures installed by Tenant at its own cost which are not part of the realty, any award for Tenant's loss of business, moving expenses or any other award to which Tenant may be entitled which does not diminish Landlord's award.

26.    **PARKING AND COMMON AREAS.**    Landlord  agrees that an area approximately equal to the common and parking areas as shown on the attached Exhibit "A" will be at all times available for the non-exclusive use of Tenant during the full Lease Term or any extension of the term hereof, provided that the condemnation or other taking by any public authority, or sale in lieu of condemnation, of any or all of such common and parking areas shall not constitute a violation of this Article. Landlord reserves the right and shall have the absolute right, outside of one hundred feet (100') of the Premises, to change the entrances, exits, traffic lanes and boundaries and size and location of such parking area or areas, and

22

common area or areas from time to time, and to block off such entrances, exits, traffic lanes and boundaries and locations of such parking areas as necessary during any period of new construction or renovation or repair or replacement of the Shopping Center . Provided, however, that anything to the contrary notwithstanding contained in this Article 26, except as required during such periods of new construction, renovation, construction of improvements, or repair or replacement of the Shopping Center or improvements thereto, said parking area or areas shall at all times by substantially equal or equivalent to that shown on the attached **Exhibit "A"**.

A.   The Landlord shall keep said automobile parking and common areas in a neat, clear and orderly condition and shall repair any damage to the facilities thereof, but expenses in connection with said automobile parking and common areas shall be charged and pro-rated in the manner as set forth in Article 6 hereof.

B.   The Tenant, for the use and benefit of Tenant, its agents, employees, customers, licensees and subtenants shall have the non-exclusive right in common with Landlord, and other present and future owners, tenants and their agents, employees, customers, licensees and subtenants to use said common parking areas during the entire term of this Lease, or any extension thereof, if any, for ingress and egress, and automobile parking.

C.   The Tenant, in the use of said common and parking areas, agrees to comply with such reasonable, non-discriminatory rules and regulations for parking as the Landlord may adopt from time to time for the orderly and proper operation of said common and parking areas. Such rules may include but shall not be limited to the following: (i) the restricting of employee parking to a limited, readily-accessible, well-lit and secure designated area or areas; and (ii) the regulation of the removal, storage and disposal of Tenant's refuse and other rubbish at the sole cost and expense of Tenant.

27.   SIGNS. The Tenant may affix and maintain upon the interior walls of the Premises such professionally manufactured signs, advertising placards, names, insignia, trademarks and descriptive material as shall comply with all applicable governmental requirements. Anything to the contrary in this Lease notwithstanding, Tenant shall not affix any sign to the roof. Tenant shall however, erect no more than one sign per elevation on the front of the Premises, in compliance with all applicable governmental requirements, not later than the date Tenant opens for business, in accordance with a design to be

23

prepared by Tenant and approved in writing by Landlord, which approval shall not be unreasonably withheld.

Tenant may also, at its sole cost and expense, construct a pylon sign in a location and of a size and style as shall be approved in writing by Landlord.

28.     DISPLAYS.  The Tenant may not display or sell merchandise or allow grocery carts or other similar devices within the control of Tenant to be stored or to remain outside the defined exterior walls and permanent doorways of the Premises. Tenant further agrees not to install any exterior lighting, amplifiers or similar devices for use in or about the Premises or any advertising medium which may be heard or seen outside the Premises in an annoying manner, such as flashing lights, search lights, loudspeakers, phonographs or radio broadcasts.

29.     AUCTIONS.  Tenant shall not conduct or permit to be conducted any sale by auction in, upon or from the Premises whether said auction be voluntary, involuntary, pursuant to any assignment for the payment of creditors or pursuant to any bankruptcy or other insolvency proceeding.

30.     INTENTIONALLY DELETED.

31.     GENERAL PROVISIONS.

A.      Plats and Riders.  Clauses, plats, riders, addenda and exhibits, if any, affixed to this Lease are a part hereof.

B.      Waiver.  The waiver of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition herein contained. The subsequent acceptance of Rent hereunder by Landlord shall not be deemed to be a waiver of any preceding default by Tenant of any term, covenant or condition of this Lease, other than the failure of the Tenant to pay the particular rental so accepted, regardless of Landlord's knowledge of such preceding default at the time of the acceptance of such rent.

C.      Joint Obligations.  If there shall be more than one Tenant the obligations hereunder imposed shall be joint and several.

D.      Marginal Headings.  The marginal headings and article titles to the articles of this Lease are not a part of the Lease and shall have no effect upon the construction or interpretation of any part hereof.

E.      Time.  Time is of the essence of this Lease and each and all its provisions in which performance is a factor.

24

F.     **Successors and Assigns.**  The covenants and conditions herein contained, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators and assigns of the parties hereto.

G.     **Recordations.**  Neither Landlord nor Tenant shall record this Lease, but a short form memorandum hereof may be recorded at the request of the Landlord.

H.     **Quiet Possession.**  Upon Tenant paying the Rent reserved hereunder and observing and performing all of the covenants, conditions and provisions on Tenant's part to be observed and performed hereunder, Tenant shall have quiet possession of the Premises for the entire term hereof, subject to all the provisions of this Lease.

I.     **Late Charges.**  Tenant hereby acknowledges that late payment by Tenant to Landlord of Rent or other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Landlord by terms of any mortgage or trust deed covering the Premises.  Accordingly, if any installment of Rent or any sum due from Tenant shall not be received by Landlord or Landlord's designee within ten (10) days after receipt by Tenant of notice of same, Tenant shall pay to Landlord a late charge equal to the prime rate, as published in the Wall Street Journal, plus three percent (3%) percent per annum on any unpaid balance due from the date such payment is due until the receipt of said unpaid balance in full by Landlord or its designee.  The parties hereby agree that as of the date this Lease is entered into such late charges represent a fair and reasonable estimate of the cost that Landlord will incur by reason of the late payment by Tenant .  Acceptance of such late charges by the Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder.

J.     **Prior Agreements.**  This Lease contains all of the agreements of the parties hereto with respect to any matter covered or mentioned in this Lease, and no prior agreements or understanding pertaining to any such matter shall be effective for any purpose.  No provision of this Lease may be amended or added to except by an agreement in writing signed by the parties hereto or their respective successors in interest.  This Lease shall not be effective or binding on any party until fully executed by both parties hereto.

25

K.     **Inability to Perform.**  Anything in this Lease to the contrary notwithstanding, Tenant and/or Landlord shall not be deemed in default with respect to the performance of any obligation on its part to be performed under this Lease if such default shall be due to strike, lockout, civil commotion, war-like operation, invasion, rebellion, hostilities, military or usurped power, sabotage, governmental regulations or controls, inability to obtain any material or service, or through acts of God or other cause or causes, whether similar or dissimilar to those enumerated, beyond the control of Tenant and/or Landlord, as the case may be, and the period for Tenant and/or Landlord to perform such obligation shall be extended by a period equal to the period of delay caused by such reason.

L.     **Partial Invalidity.**  Any provision of this Lease which shall prove to be invalid, void, or illegal shall in no way affect, impair or invalidate any other provisions hereof and such other provisions shall remain in full force and effect.

M.     **Cumulative Remedies.**  No remedy or election hereunder shall be deemed exclusive but shall, whenever possible, be cumulative with all other remedies at law or in equity.

N.     **Choice of Law.**  This Lease shall be governed by the laws of the State in which the Premises are located.

O.     **Attorneys' Fees.**  In the event of any action or proceeding brought by either party against the other under this Lease the prevailing party shall be entitled to recover for the fees of its attorney in such action or proceeding, including costs of appeal, if any, in such amount as the court may adjudge reasonable as attorneys' fees.

P.     **Sale of Premises by Landlord.**  In the event of any sale of the Premises by Landlord, Landlord shall be and is hereby entirely free and relieved of all liability under any and all of its covenants and obligations contained in or derived from this Lease arising out of any act, occurrence or omission occurring after the consummation of such sale; and the purchaser, at such sale or any subsequent sale of the Premises shall be deemed, without any further agreement between the parties or their successors in interest or between the parties and any such purchaser, to have assumed and agreed to carry out any and all of the covenants and obligations of the Landlord under this Lease.

Q.     **Surrender of Premises.**  Upon any termination of the Lease Term, Tenant shall quit and surrender to Landlord the leased Premises, broom clean, in good order and condition, damage by fire or other casualty, the elements, and/or Landlord's repair obligations and normal wear and tear excepted.

26

Tenant shall (unless otherwise directed by Landlord) remove at Tenant's expense all trade fixtures, inventory, stock in trade, furniture and other personal property installed by Tenant and shall repair all damage to the Leased Premises caused by such removal.

R.     **Subordination, Attornment.** Upon request of the Landlord, Tenant will in writing subordinate its rights hereunder to any ground lease, prior lease pursuant to which Landlord holds its interest in the Premises, the lien of any mortgage or deed of trust, to any bank, insurance company or other lending institution, now or hereafter in force against the Premises or the Shopping Center, and to all advances to be made upon the security thereof, substantially in the form of Exhibit "E" attached hereto, and made a part hereof. Within thirty (30) days after the execution of this Lease, Landlord shall deliver such a non-disturbance agreement to Tenant from Landlord's mortgagee(s) of the Shopping Center.

In the event any proceedings are brought for termination, foreclosure to retake possession, or in the event of the exercise of the power of sale under any mortgage or deed of trust made by the Landlord covering the Premises, the Tenant shall attorn to the purchaser or other moving party who is successful upon any such termination, foreclosure, retaking of possession or sale and recognize such purchaser or party as the Landlord under this Lease.

The provisions of this Article to the contrary notwithstanding and so long as Tenant is not in default hereunder, this Lease shall remain in full force and effect for the full term hereof.

S.     **Notices.** All notices and demands which may or are to be required or permitted to be given by either party or the other hereunder shall be in writing. All notices and demands by the Landlord to the Tenant shall be sent by United States Mail, postage prepaid, addressed to the Tenant at the Premises and at the address herein below, or to such other place as Tenant may from time to time designate in a notice to the Landlord, to replace the address stated hereinbelow. All notices and demands by the Tenant to the Landlord shall be sent by United States Mail, postage prepaid, addressed to the Landlord at the address set forth herein, and to such other person or place as the Landlord may from time to time designate in a notice to the Tenant. Such notices shall be effective upon receipt or refusal to accept delivery.

TO LANDLORD AT:                          TO TENANT AT:

HSS Real Estate, Inc.                    Murray's Discount Auto Stores, Inc.
35 West Wacker Drive, Suite 3240         8080 Haggerty Road
Chicago, Illinois, 60601                 Belleville, Michigan 48111
Attn: Vice President, Director of Operations     Attn: Chief Executive Officer

27

T.    **Tenant's Statement.**  Tenant shall at any time and from time to time, upon not less than ten (10) days' prior written notice from Landlord, execute, acknowledge and deliver to Landlord a statement in writing substantially in the form of Exhibit "D" attached hereto and made a part hereof: (a) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease as so modified is in full force and effect), and the date to which the rental and other charges are paid in advance, if any; and (b) acknowledging that there are not, to Tenant's knowledge, any unsecured defaults on the part of the Landlord or Tenant hereunder, or specifying such defaults if any are claimed; and (c) setting forth the date of commencement of rents and expiration of the term hereof.  Any such statement may be relied upon by the prospective purchaser or encumbrancer of all or any portion of the real property of which the Premises are a part.  At Tenant's request, Landlord shall deliver a comparable certificate to Tenant.

U.    **Authority of Tenant.**  If Tenant is a corporation, each individual executing this Lease on behalf of said corporation represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of said corporation, in accordance with the by-laws of said corporation, and that said corporation is in good standing in the state of its incorporation.

V.    **Intentionally  Deleted.**

32.    **BROKERS.**  Landlord and Tenant each warrants that, except for Grubb & Ellis Company, who shall be paid by Landlord, it has had no dealings with any real estate broker or agents in connection with the negotiation of this Lease and it knows of no real estate broker or agent who is entitled to a commission in connection with this Lease. Landlord and Tenant each agrees to indemnify and hold harmless the other for and from any and all claims and causes whatsoever, made by any broker in connection with this Lease who makes any claims of brokerage regarding it in relation to this Lease.

33.    **INTENTIONALLY  DELETED.**

34.    **SIGN CRITERIA.**  The installation of a sign and the costs incurred shall be the responsibility of the Tenant.  Sign construction is to completed in compliance with the instructions, limitations, and criteria contained herein.

A.    It is intended that the signage of the stores in the Shopping Center shall be developed in an imaginative and varied manner, and although previous and current signing practices of the Tenant will be considered, they will not govern signs to be installed in the Center.

28

B.    Each Tenant will be required to identify its Premises by a sign. Only one sign will be permitted per elevation and it shall be mounted at locations designated by Landlord.

C.    Sign drawings shall clearly show graphic as well as construction and attachment details. Full information regarding electrical requirements and brightness in foot-lamberts is to also be included.

D.    Five (5) copies of sign drawings shall be submitted to Landlord for approval prior to fabrication of sign.

E.    Intentionally Deleted.

F.    All signs shall have concealed attachment devices, clips, wiring, transformers, lamps, tubes and ballast.

G.    Sign letters or components shall not have exposed neon or other lamps. All light's source shall be internal and concealed. Sign letters or components may be back-illuminated with lamps contained wholly within the depth of the letter. Maximum brightness shall not be less than 75 foot-lamberts.

H.    The heights of sign letter or components shall not exceed 36". (See Exhibit C)

I.    The extreme outer limits of sign letters, components, or insignia shall fall within a rectangle the length of which shall not exceed 60% of the linear distance of the front of the Lease Premises. No part of such sign shall be closer than 18" to the side lease lines (or an extension of lease lines for canopy mounted sign) of the Leased Premises nor closer than 6" to the top or bottom of Tenant's sign area. No part of the sign shall hang free of Tenant's sign area.

J.    Sign depth shall not exceed 6".

K.    All sign letters, including insignia and logo when permitted by Landlord, shall be channel formed metal with uncapped plastic faces, metal faces for back-illuminated signs.

L.    The following are specific requirements for exterior door signs:

Signs for service door identification of Tenant's store may only contain the name of the Tenant printed on the service doors with a standard, uniform paint color, letter style, size and location which shall be specified by the Landlord.

35.    HAZARDOUS SUBSTANCES:  Tenant shall not cause any Hazardous Substances (as defined below) to be used, stored, generated, or disposed of on or in the Premises or the building or the Shopping Center without Landlord's prior written consent, except for items included within Tenant's usual inventory, normal office products and supplies of the type, and in the amount used in the normal course of

29

business and in compliance with applicable laws, rules, or regulations. If Tenant causes the presence of
any Hazardous Substances on or in the Premises or the building or the Shopping Center, Tenant, at its
sole cost and expense, shall promptly take any and all actions necessary or required to return the
Premises and the building and the Shopping Center to the condition existing prior to the presence of any
Hazardous Substances so caused by Tenant. Tenant shall obtain Landlord's written consent prior to
commencing any such remedial action.

With respect to any Hazardous Substances on or in the Shopping Center which have not been
caused by Tenant, Landlord, at its sole cost and expense, shall promptly take any and all actions
necessary or required to return the Shopping Center to the condition existing prior to the presence of any
such Hazardous Substances. To the best of its knowledge, Landlord represents that the Shopping
Center (including the Premises) does not contain any Hazardous Substances as of the date hereof.

As used in this Lease, "Hazardous Substances" means any substance that is toxic,
etiological, ignitable, reactive, or corrosive or that is regulated by any Federal, state or local governmental
agency, law, rule, or ordinance, and includes without limitation, asbestos, polychlorinated biphenyls,
petroleum products, substances that are or may be toxic to humans, animals, plants, or the environment,
and any and all materials or substances defined as "Hazardous Waste", "Extremely Hazardous Waste" or a
"Hazardous Substance" pursuant to any Federal, state or local governmental agency, law, rule or
ordinance.

36.     OPTION(S) TO RENEW.  If at the time of the giving of the notice as hereinafter provided, or at
the commencement of the extended term, Tenant is not in default under the terms of this Lease after the
expiration of applicable cure periods provided for under the Lease, Tenant shall have the right to be
exercised as provided below, to extend the Lease Term for three (3) additional consecutive periods of five
(5) years each upon satisfaction of the following terms and conditions. This extension of the Lease Term
is conditioned upon the happening of all of the follows:

(A.) The Lease is in full force and effect throughout the original or extended Lease Term; and

business and in compliance with applicable laws, rules, or regulations. If Tenant causes the presence of any Hazardous Substances on or in the Premises or the building or the Shopping Center, Tenant, at its sole cost and expense, shall promptly take any and all actions necessary or required to return the Premises and the building and the Shopping Center to the condition existing prior to the presence of any Hazardous Substances so caused by Tenant. Tenant shall obtain Landlord's written consent prior to commencing any such remedial action.

With respect to any Hazardous Substances on or in the Shopping Center which have not been caused by Tenant, Landlord, at its sole cost and expense, shall promptly take any and all actions necessary or required to return the Shopping Center to the condition existing prior to the presence of any such Hazardous Substances. To the best of its knowledge, Landlord represents that the Shopping Center (including the Premises) does not contain any Hazardous Substances as of the date hereof.

As used in this Lease, "Hazardous Substances" means any substance that is toxic, etiological, ignitable, reactive, or corrosive or that is regulated by any Federal, state or local governmental agency, law, rule, or ordinance, and includes without limitation, asbestos, polychlorinated biphenyls, petroleum products, substances that are or may be toxic to humans, animals, plants, or the environment, and any and all materials or substances defined as "Hazardous Waste", "Extremely Hazardous Waste" or a "Hazardous Substance" pursuant to any Federal, state or local governmental agency, law, rule or ordinance.

36.    **OPTION(S) TO RENEW.** If at the time of the giving of the notice as hereinafter provided, or at the commencement of the extended term, Tenant is not in default under the terms of this Lease after the expiration of applicable cure periods provided for under the Lease, Tenant shall have the right to be exercised as provided below, to extend the Lease Term for three (3) additional consecutive periods of five (5) years each upon satisfaction of the following terms and conditions. This extension of the Lease Term is conditioned upon the happening of all of the follows:

(A.) The Lease is in full force and effect throughout the original or extended Lease Term; and

(B.) At the time Tenant exercises its option to extend the Lease Term and at the time the extension goes into effect, Tenant is not in default under any of the terms or provisions of this Lease; and

(C.) Landlord has received written notice from Tenant of its election to exercise the right to extend the term of this Lease, pursuant to any rights granted by this Lease (hereinafter referred to as

30

"Notice of Election"). The Notice of Election shall state that the Tenant is electing to renew this Lease in accordance with this Article 36 of the Lease. This Notice of Election must be given to Landlord at the address stated in this Lease, or such other address as Tenant has been notified of in writing, and must be received by Landlord no later than one hundred eighty (180) days prior to the expiration of this Lease. The said Notice of Election must be sent by certified or registered United States Mail, postage prepaid; and

(D.) The Renewal Lease shall be upon the same terms, covenants and conditions contained in this Lease. Minimum Rent during the Renewal of the Lease shall be paid in accordance with the term and conditions and covenants contained in this Lease; and

(E.) The Renewal of this Lease shall give the Tenant no further right of renewal, except as provided for herein in this Article 36 of the Lease.

37.    **EXCULPATION**. Notwithstanding anything to the contrary provided in this Lease, it is understood and agreed that there shall be absolutely no personal liability on the part of any officer, director, shareholder, partner, employee or agent of Landlord (or any successor corporate landlord or any partner of any limited or general partnership which is or may become Landlord or any individual or other entity) with respect to any of the terms, covenants and conditions of this Lease; and Tenant shall look solely to the equity, if any, of Landlord in the Shopping Center for the satisfaction of each and every remedy of Tenant in the event of breach or default by Landlord of any of the terms, covenants and conditions of this Lease, such exculpation of personal liability to be absolute and without any exception whatsoever. No other property or assets of Landlord shall be subject to judgment, levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease, the relationship of Landlord and Tenant hereunder or Tenant's use or occupancy of the Premises.

No abatement, diminution or reduction of Rent or other charges required to be paid by Tenant pursuant to the terms of this Lease, shall be claimed by or allowed to Tenant for any inconvenience, interruption, cessation or loss of business or otherwise caused directly or indirectly by any legal requirement, or by priorities, rationing or curtailment of labor or material, or by war, civil commotion, strikes or riots, or any matter or thing resulting therefrom, or any other cause or causes outside of Landlord's reasonable control, nor shall this Lease be affected by any such causes.

31

38.    **RELATIONSHIP OF THE PARTIES.**    It is the intention of the parties hereto to create the relationship of Landlord and Tenant, and no other relationship whatsoever, and unless expressly otherwise provided herein, nothing herein shall be construed to make the parties hereto liable for any of the debts, liabilities or obligations of the other party.  Tenant acknowledges that the Premises are the property of Landlord and that Tenant has only the right to the possession and use thereof upon the terms, covenants and conditions set forth in this Lease.

39.    **WAIVER OF TRIAL BY JURY.**    Landlord and Tenant do hereby waive trial by jury in any action, proceeding or counterclaim brought by either against the other, upon any matters whatsoever arising out of or in any way connected with this Lease, Tenant's use or occupancy of the Premises, and/or any claim of injury or damage.  It is further mutually agreed that in the event Landlord commences any summary proceeding for non-payment of Minimum Rent or additional Rent, Tenant will not interpose any counterclaim of whatever nature or description in any such proceeding, unless the failure to raise the same would constitute a waiver hereof.

40.    **CONSTRUCTION.**    This Lease shall be construed and interpreted without regard to any presumption or rule requiring construction against the party causing the instrument to be drafted.  This Lease is the result of negotiations between the Parties hereto, each of whom is represented by counsel of its own choosing.  The Landlord and the Tenant shall each be deemed to have drawn this Lease and no negative inference or interpretations shall be made by a court against the party whose counsel drafted this Lease.

41.    **LAND TRUST.**    The parties hereto acknowledge that fee simple title to the Premises is held in an Illinois Land Trust of which the Landlord is the Beneficiary.  The Landlord herein is the beneficiary of the land trust and has the authority to exercise the power of direction thereunder, and the right to execute this lease as beneficiary.

32

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first above written.

**TENANT**

MURRAY'S DISCOUNT AUTO STORES, INC.
a Michigan corporation

BY: _____
C. E. O.
ITS:  Chief Executive Officer

ATTEST:

BY: Deborah Smith

**LANDLORD**

HSS DEVELOPMENT, INC.
an Illinois corporation

BY: _____
Mitchell Saywitz
ITS: y President
Vice

ATTEST:

BY: Donna Thixton

33

Oreilly                                          12:06:56 p.m.     12-07-2015        41/46



## EXHIBIT "B"

**LANDLORD'S WORK:**

Landlord shall construct an approximately 100' x 100' building in accordance with the prototypical tenant plans entitled "Specifications for: Murray's Discount Auto." Tenant reserves the right to approve the exterior lighting plan in the immediate area of the building, which such approval shall not be unreasonably withheld.



EXHIBIT "C"

Typical Signage

Building



Lit Channel Letters on Wall
40" and 18" letters

Pylon

Pole



6027983265     Oreilly                                    12:07:40 p.m.    12-07-2015      43 /46

## EXHIBIT "D"

### TENANT ESTOPPEL CERTIFICATE

TO: _____

THIS IS TO CERTIFY THAT:

1.      The undersigned is the Tenant under that certain Lease dated _____ by and between _____, as Landlord and _____, as Tenant, covering those certain Premises commonly known and designated as _____.

2.      The Lease has not been modified, changed, altered or amended in any respect (except as indicated following this sentence) and is the only Lease or agreement between the undersigned and the Lessor affecting said Premises. If none, state "NONE": _____.

3.      The undersigned has made no agreements with Landlord or its agents or employees concerning free rent, partial rent, rebate or rental payment or any other type of rental concession (except as indicated following this sentence). If none, state "NONE": _____.

4.      The undersigned has accepted and now occupies the Premises, and is and has been open for business since _____, 19____. The lease term began _____, 19____. No rent has been prepaid for more than two (2) months. The fixed Minimum Rent is $_____ per month.

5.      To the knowledge of the undersigned, the Lease is not in default and is in full force and effect. To the knowledge of the undersigned, as of the date hereof, the undersigned is entitled to no credit, no free rent and no offset or deduction in rent.

6.      The undersigned has received or will receive payment or credit for tenant improvement work in the total amount of $_____ (or if other than cash, describe below). If none, state "NONE": _____.

7.      The Lease contains and the undersigned has no outstanding options or rights of first refusal to purchase the Premises or any part thereof or the real property of which the Premises are a part.

8.      No actions, whether voluntary or otherwise, are pending against the undersigned under the bankruptcy laws of the United State or any state thereof.

DATED THIS _____ DAY OF _____, 19____.

_____, Tenant

BY: _____

ITS: _____

## EXHIBIT "E"

### SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS AGREEMENT, dated this _____ day of _____, 19____ between _____ hereinafter called "Mortgagee", and _____, hereinafter called "Tenant".

### WITNESSETH

(A) Tenant has entered into a certain lease dated _____, 19____ with _____ hereinafter called "Landlord", covering Premises in a certain building known as _____ and located in _____; and

(B) Mortgagee has agreed to make a mortgage loan of _____ ("the Mortgage") to the Landlord and the parties desire to set forth their agreement as hereinafter set forth.

NOW THEREFORE, in consideration of the Premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledge, it is hereby agreed as follows:

1. Said lease is and shall be subject and subordinate to the Mortgage insofar as it affects the real property of which the demised Premises forms a part; and to all renewals, modifications, consolidations, replacements and extensions thereof, to the full extent of the principal sum secured thereby and interest thereon.

2. Tenant agrees that, upon the assumption of Landlord's obligations under the Lease, it shall attorn to and recognize any purchaser at a foreclosure sale under the Mortgage, any transferee who acquires the demised Premises by deed in lieu of foreclosure; and the successors and assigns of such purchasers, as its Landlord for the unexpired balance (and any extensions, if exercised) of the term of said lease upon the same terms and conditions set forth in said lease.

3. In the event that it should become necessary to foreclose the Mortgage, Mortgagee thereunder will not terminate said lease nor join Tenant in summary or foreclosure proceedings.

4. In the event that Mortgagee shall succeed to the interest of Landlord under such lease, Mortgagee shall not be:

(a) liable for any act of omission of any prior landlord (including Landlord, other than continuing defaults); or

(b) liable for the return of any security deposit; or

(c) subject to any offsets or defenses which Tenant might have against any prior Landlord (including Landlord); or

(d) bound by any rent or additional rent which Tenant might have paid for more than the current month to any prior landlord (including Landlord); or

(e) bound by any amendment or modification of the lease made without its consent.

5. Notwithstanding anything herein contained to the contrary, all condemnation awards and insurance proceeds paid or payable with respect to the real property of which the demised Premises forms a part and received by the Mortgagee shall be applied and paid in the manner set forth in this Lease.

6. Mortgagee hereby acknowledges and agrees that all fixtures and equipment whether owned by Tenant or any subtenant or leased by Tenant, installed in or on the demised Premises, regardless of the manner or mode of attachment, shall be and remain the property of Tenant and may be removed by Tenant at any time. In no event (including a default under the Lease or Mortgage) shall Mortgagee have any lien, rights or claims in Tenant's fixtures and equipment whether or not all or any part thereof shall be deemed fixtures; and Mortgagee expressly waives all rights of levy, distraint or execution with respect to said fixtures and equipment.

IN WITNESS WHEREOF, the parties hereto have execute these presents the day and year as written below.

LANDLORD OR MORTGAGEE                    TENANT

BY: _____                      BY: _____
DATE: _____                    DATE: _____
ATTEST: _____                  ATTEST: _____

**EXHIBIT "F"**

INTENTIONALLY DELETED

SITE PLAN: